PEOPLE v GARCIA

OPINION OF THE COURT

1. CONSTITUTIONAL LAW—CRIMINAL LAW—CONSTITUTIONAL STAN-
DARDS—POLICE ACTIVITIES—RESTRICTION.

A state is free as a matter of its own law to impose greater
restrictions on police activity than those which the United
States Supreme Court holds to be necessary under Federal
constitutional standards.

2. SEARCHES AND SEIZURES—REASONABLENESS—TIME OF SEARCH OR
SEIZURE—POLICE OFFICER—INFORMATION.

The reasonableness of any search or seizure must be determined
as of the time of the search or seizure; in the determination of
reasonableness, consideration may be given to the information
possessed by the police officer who is conducting the search or
seizure.

3. SEARCHES AND SEIZURES—OUTSIDE OF CURTILAGE—REASONABLENESS
—CONSTITUTIONAL LAW—CONSTRUCTION—EVIDENCE.

The proviso in a section of an article of the Michigan Constitu-
tion protecting against "unreasonable searches and seizures"
which prohibits the exclusion from evidence of "any narcotic
drug, firearm, bomb, explosive or any other dangerous weapon,
seized by a peace officer outside the curtilage of any dwelling
house" precludes a construction of the Michigan search and
seizure clause imposing a higher standard of reasonableness for
searches and seizures of items named in the proviso than the
United States Supreme Court has held applicable under the
Fourth Amendment (US Const, Am IV, Const 1963, art 1, § 11).

4. SEARCHES AND SEIZURES—INTERIM BAIL STATUTE—HIGHER STATE
STANDARD—ARREST—TRAFFIC VIOLATION—PAT-DOWN SEARCH—
SUPPRESSION OF EVIDENCE—STATUTES.

The interim bail statute embodies a legislative policy affording a

REFERENCES FOR POINTS IN HEADNOTES
[1-3] 68 Am Jur 2d, Searches and Seizures §§ 5, 6.
[2] 68 Am Jur 2d, Searches and Seizures §§ 68–70.
[3] 68 Am Jur 2d, Searches and Seizures § 20.
[4-6] 8 Am Jur 2d, Bail and Recognizance § 21.
    68 Am Jur 2d, Searches and Seizures §§ 39, 103.

qualification for higher state standards on police conduct involved in searches and seizures than those required under the Federal standard; therefore, it was unreasonable for a police officer after arresting defendant for a minor traffic violation and completing an otherwise proper frisk for weapons to proceed with a more intrusive search of the defendant's inner pockets which cannot be justified either as a protective search for weapons or as an effort to uncover evidence of a traffic offense, and evidence seized in the further search should be suppressed (MCLA 780.581; MSA 28.872[1]).

5. CRIMINAL LAW—SEARCHES AND SEIZURES—INTERIM BAIL STATUTE—
   TRAFFIC OFFENSES—CUSTODIAL ARREST—PAT-DOWN SEARCH—
   STATUTES.

A police officer after stopping a defendant for a minor traffic violation for which a custodial arrest is made and after a pat-down search for weapons is made has a duty to inform the defendant of the defendant's rights under the interim bail statute and, upon arrival at the station house, to accept bail proffered by the defendant or one acting on his behalf if no magistrate is readily available for an arraignment (MCLA 780.581; MSA 28.872[1]).

DISSENT BY J. H. GILLIS, J.

6. SEARCHES AND SEIZURES—SEARCH INCIDENT TO ARREST—CUSTODIAL
   ARREST—INTERIM BAIL STATUTE—WEAPONS.

*The interim bail statute does not circumvent the right of a police officer to guarantee his own safety by restricting his right to search an individual who is under full custodial arrest; a police officer has every right to insure that the individual he has arrested does not possess any instrument which could be used as a weapon to harm the officer or effectuate an escape (MCLA 780.581; MSA 28.872[1]).*

Appeal from Saginaw, Hazen R. Armstrong, J. Submitted October 5, 1977, at Lansing. (Docket No. 28413.) Decided February 7, 1978.

Jose Garcia was convicted of possession of cocaine, carrying a weapon in an automobile, extortion, and subornation of perjury. Defendant appeals. Conviction for possession of cocaine and

carrying a weapon in an automobile vacated; conviction for extortion and subornation of perjury affirmed, and the matter remanded.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Robert L. Kaczmarek,* Prosecuting Attorney, and *Lawrence W. Smith,* Assistant Prosecuting Attorney, for the people.

*Doherty & Thomas, P. C.,* for defendant on appeal.

Before: D. C. RILEY, P. J., and J. H. GILLIS and R. M. MAHER, JJ.

PER CURIAM. Following a jury trial, defendant Jose Garcia appeals his conviction of possessing the controlled substance cocaine, MCLA 335.341(4)(b); MSA 18.1070(41)(4)(b), carrying a weapon in an automobile, MCLA 750.227; MSA 28.424, extortion, MCLA 750.213; MSA 28.410, and subornation of perjury, MCLA 750.424; MSA 28.666.

## I.

On September 25, 1974, at approximately 6 a.m., Officer Jessie Ibanez, patrolling alone in the city of Buena Vista, observed the driver of a 1973 Pontiac make an improper left turn. Officer Ibanez followed the Pontiac and signaled the driver to pull over. The driver (later identified as defendant) came to a stop in an adjacent K-Mart parking lot. The sole passenger, Marcos Martinez, remained in the Pontiac.

Emerging from his car, defendant met the officer between the two vehicles. The officer advised de-

fendant of the reason for the stop *(viz.,* an improper left turn and failure to signal for a left turn) and asked him for his operator's license. Defendant responded that he had no license in his possession.[1] Officer Ibanez directed defendant to the police car, informed him that he "would have to go with" the officer and instructed him to place his hands on the patrol car. The policeman then began to pat defendant down "because he was going to jail". The officer testified at trial that he was searching defendant for weapons and not contraband. In the course of this search, the officer felt an object in an inner pocket of defendant's jacket, an "object which I thought was a file or something * * * [because] when I pressed it, it maintained its shape". This testimony conflicted with the officer's account at the preliminary examination:

"Q. *[Defense attorney]* [D]id it feel like a knife to you?
"A. *[Officer Ibanez]* No, sir.

                    *    *    *

"Q. Did it feel like a weapon of any kind to you?
"A. It felt like something that wouldn't retain its a * * * it kept retaining its shape, when I squeezed it.
"Q. But not like a weapon?
"A. No, sir."

Apprised of the conflict by defense counsel, Officer Ibanez acknowledged his prior testimony, including the statement that the object did not feel like a weapon. Defense counsel then asked:

"Q. Now you said you knew it was a file?
"A. *[Officer Ibanez]* No, sir, I didn't say it was a file. I said it could have been a file; could be anything.

---

[1] Defendant testified, and Officer Ibanez denied, that defendant identified himself to the officer.

"Q. Could be anything. Could be a piece of paper.

"A. Could also be a piece of tinfoil."

The record discloses that the unresilient object turned out to be a tinfoil packet containing cocaine. A more thorough search of defendant's pockets yielded another tinfoil packet of cocaine. At this, Officer Ibanez placed defendant in the back seat of the patrol car, radioed for back-up support, and, on the arrival of Officer Richard Schaefer, approached the passenger, Martinez. At Officer Ibanez's request, Martinez stepped from the car.

"Q. *[Defense attorney]* Why did you ask him to step out of the vehicle?

"A. *[Officer Ibanez]* I wanted to see—I had reason to believe possibly there was some more in the car, possibly more narcotics, more narcotics—there could be more.

"Q. Then what did you do, after he got out of the car? Did you proceed to search him?

"A. No, I asked him for I.D. He said he didn't have none. Then I asked him to—when I was asking him to turn around, I put my hand on his back pocket. So he had a wallet. I took it out. He had I.D."

Officer Ibanez then searched Martinez more thoroughly, discovering in the process seven .45-caliber bullets. The officer then led Martinez to the cruiser and told him to sit in the back seat. Next Officer Ibanez removed defendant from the back seat, placed handcuffs on him and directed him to sit beside Martinez. With Officer Schaefer standing by, Officer Ibanez searched the front seat of the Pontiac but found nothing. A second search, conducted by both officers, again produced nothing. At this point, Officer Ibanez returned to the cruiser and talked to Martinez, telling him that if a gun

were found in the car he (Martinez) would go to
jail. Officer Ibanez also told Martinez that if he
cooperated the police would give him a break.
Martinez then stated that there was a gun in the
car, allegedly without specifying its precise loca-
tion, but added that it was not his. Officer Ibanez
then released Martinez and permitted him to walk
away. A third and final search disclosed a .45-
caliber gun between the driver's bucket seat and
the console.[2]

In addition to the foregoing testimony, Officer
Ibanez related several instances, subsequent to the
discovery of the cocaine, in which defendant ut-
tered threats against the officer and his family; the
defendant, according to Officer Ibanez, also urged
the officer to testify untruthfully in court. These
alleged statements by defendant ultimately led to
the extortion and subornation of perjury charges.

## II.

In a pre-trial motion, a motion for directed
verdict and on appeal to this Court, defendant has
consistently urged suppression of the cocaine, the
gun "and all testimony of appellant's threats and
bribes" as the poisonous fruit of an illegal search.
Specifically, defendant contends (1) that, under
Michigan law, the full search of defendant's per-
son incident to an arrest for a traffic offense ex-
ceeded the permissible limits of a protective pat-
down search; (2) that, under the interim bail stat-
ute, MCLA 780.581; MSA 28.872(1), as interpreted
in *People v Dixon,* 392 Mich 691; 222 NW2d 749
(1974), the instant personal search contravened

---

[2] Produced at trial, Martinez testified on defense cross-examination
that he had earlier planted two tinfoil packets of cocaine on defend-
ant and later had secreted the gun under the seat while Officer
Ibanez frisked defendant.

defendant's right to post bail prior to being subjected to any custodial search or seizure; and (3) the automobile search, conducted after defendant had been taken into custody, was unjustified since it could not have yielded fruits of a traffic violation.

## A.

Defendant concedes that as a matter of Federal constitutional law the search of his person did not offend the Fourth Amendment. *United States v Robinson,* 414 US 218; 94 S Ct 467; 38 L Ed 2d 427 (1973), *Gustafson v Florida,* 414 US 260; 94 S Ct 488; 38 L Ed 2d 456 (1973).[3] Instead, defendant urges us to hold the instant searches, precipitated by a concededly valid traffic arrest, unreasonable under state law.

Undoubtedly, "a State is free *as a matter of its own law* to impose greater restrictions on police activity than those * * * [the United States Supreme] Court holds to be necessary upon federal constitutional standards. See, *e.g., Cooper v California,* 386 US 58, 62 [87 S Ct 788; 17 L Ed 2d 730] (1967); *Sibron v New York,* 392 US 40, 60–61 [88 S

---

[3] In *Robinson,* the Supreme Court held:

"The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." 414 US at 235; 94 S Ct at 477; 38 L Ed 2d at 440–441.

*Accord, Gustafson v Florida,* 414 US 260; 94 S Ct 488; 38 L Ed 2d 456 (1973).

Ct 1889; 20 L Ed 2d 917] (1968). See also *State v Kaluna,* 55 Haw 361, 368–369, 520 P 2d 51, 58–59 (1974)." *Oregon v Hass,* 420 US 714, 719; 95 S Ct 1215; 43 L Ed 2d 570 (1975). And, to be sure, a number of cases have declined to apply *Robinson* and *Gustafson, supra,* in interpreting their law. See *Zehrung v State,* 569 P2d 189 (Alaska, 1977), *People v Brisendine,* 13 Cal 3d 528; 119 Cal Rptr 315; 531 P2d 1099 (1975), *People v Clyne,* — Colo —; 541 P2d 71 (1975), *State v Kaluna, supra.*

The Michigan Supreme Court, although having had occasions to comment on *Robinson* and *Gustafson, supra,* has never expressly ruled that these Federal cases apply in the factual setting now before us. *Cf., People v Stergowski,* 391 Mich 714, 724–726; 219 NW2d 68 (1974), *People v Moore,* 391 Mich 426, 432–435; 216 NW2d 770 (1974), and *People v Dixon, supra,* at 706–707.

In *Stergowski,* our Supreme Court affirmed the denial of defendant's motion to quash or suppress evidence of heroin found in a search of defendant's person. Defendant Stergowski had been lawfully arrested for assaulting a police officer. The arresting officer noticed " 'a large bulge in * * * [defendant's] right pocket' ". 391 Mich at 716. Feeling the bulge, the officer noted that " 'it appeared to have some bullets in there' ". 391 Mich at 716. He emptied the pocket of its contents:

" 'a large quantity of money, some of it being counterfeit, and four bullets for a 9-millemeter gun and some heroin and a plastic vial, and inside the plastic vial there was 11 tinfoil packs [later found to contain heroin].' " 391 Mich at 716.

Although noting the holdings in *Robinson* and *Gustafson, supra,* the Michigan Supreme Court ultimately ruled:

"It is unquestioned that defendant was subject to a warrantless search incident to * * * [a] lawful arrest. In *People v Tisi,* 384 Mich 214; 180 NW2d 801 (1970), the Court said at p 219:

" 'The reasonableness of any search or seizure must be determined as of the time of the search or seizure. In the determination of reasonableness, consideration may be given to the information possessed by the officer. *People v Harper* (1962), 365 Mich 494 [113 NW2d 808].'

"The search is to be tested 'in light of the information or facts possessed by the officer at the time he made the search'. *People v Danny Williams,* 383 Mich 549, 556; 177 NW2d 151 (1970).

"The police had received a report of an individual firing 'shots'. They saw defendant carrying what looked to be and was a pistol and ordered defendant to drop the gun. Defendant refused to drop the weapon when ordered and fled from the officers. The officers properly followed him into a house where he tried to hide the weapon but was disarmed. Defendant struck an officer with a metal box. Defendant was lawfully arrested. All these facts justify the body search. It was reasonable and proper. The entire range of search and seizure cases speak to the 'reasonableness' of the procedures. In the context of this series of events, the officers' acts were reasonable." 391 Mich at 727–728. (Footnote omitted.)

In *Dixon, supra,* the Supreme Court relied on the prior version of the interim bail statute in effect at the time of defendant's arrest, MCLA 780.581; MSA 28.872(1), to support suppression of heroin found on defendant during a station house search, where defendant had already been searched for weapons prior to his arrival at the jail:

"We are persuaded * * * that the sense of the statute and its purpose of avoiding unnecessary incarceration of minor offenders can only be served by imposing on the arresting officer (and now, the sheriff as well) the

duty to inform the person about to be jailed of the statutory protection of which he otherwise would probably be ignorant.

* * *

"Any evidence gained in derogation of this statutory right is to be suppressed; no other remedy is as likely to assure its full enforcement and the protection of the citizenry at large from unwarranted and unnecessary inconvenience, embarrassment and risk attendant incarceration for a minor traffic offense." 392 Mich at 703, 705–706.

Distinguishing *Robinson* and *Gustafson, supra,* the Court observed:

"Dixon had already been searched for weapons before even entering the police car. The station house procedures were not intended nor could they be justified as a further search for either weapons or possible fruits of the crime." 392 Mich at 706. (Footnote omitted.)

In *Moore, supra,* a police officer arrested defendant " 'for soliciting for immoral purposes' ". 391 Mich at 432.

"Moore [then] placed his hand in his pants pocket. The officer, believing Moore might be reaching for a weapon, grabbed him and spun him against the side of an automobile. Moore then opened his right hand and a small plastic vial fell to the ground.

"The vial was of clear plastic with a snap-on top of a kind commonly used by pharmacies to dispense medicine. The vial was unlabeled. Inside were 20 small capsules containing white powder. Eighteen capsules were of clear plastic and the other two were red. The capsules lacked the fresh, uniform appearance typical of capsules dispensed by a pharmacy. Immediately upon taking Moore to the police station, the officer conducted a cursory examination of the vial, concluded that the capsules contained heroin, and then arrested Moore on a narcotics charge." *Id.* (Footnote omitted.)

Reiterating without clearly approving the holdings of *Robinson* and *Gustafson, supra,* the Court then said:

"In both *Robinson* and *Gustafson* there were motions to suppress and full hearings concerning the reasonableness of the seizure. Moore did not move to suppress and there is no reason on this record to question the reasonableness of the arresting officer's belief upon his cursory examination that the white powder contained in the aberrant transparent capsules in the curiously unmarked, transparent vial was heroin." 391 Mich at 433–434. (Footnote omitted.)

In a footnote appended to this passage, the Court stated in part:

"We express no opinion * * * about the *constitutional validity* of an examination by the arresting officer of the seized material any more intensive or time-consuming than a cursory examination like those conducted by the arresting officers in *Robinson, Gustafson* and this case. *Cf. People v Trudeau,* 385 Mich 276, 279–281; 187 NW2d 890 (1971); *People v Roderick Walker,* 27 Mich App 609; 183 NW2d 871 (1970)." 391 Mich at 434–435, fn 5. (Emphasis added.)

Further, the Court noted:

"While Const 1963, art 1, § 11 protects against 'unreasonable searches and seizures', its proviso prohibiting the exclusion from evidence of 'any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house', precludes a construction of the Michigan search and seizure clause imposing a higher standard of reasonableness for searches and seizures of items named in the proviso than the United States Supreme Court has held applicable under the Fourth Amendment. In *People v Pennington,* 383 Mich 611; 178 NW2d 471 (1970), this Court held the narcotic and

firearms proviso invalid under the Federal constitution only to the extent it would permit receipt of evidence barred under the Fourth and Fourteenth Amendments as construed by the United States Supreme Court." 391 Mich at 435. (Footnotes omitted.)

### B.

As we perceive it, the question defendant frames is not whether as a matter of state constitutional law, Const 1963, art 1, § 11, we may impose higher standards on police conduct than those federally required, but whether the legislative policy embodied in the interim bail statute affords a justification for the imposition of such higher standards. We are persuaded that the defendant's contention is correct.

Here, defendant was arrested for a minor traffic offense. He readily complied with the officer's signal to stop the car and obligingly permitted the officer to search his person.[4] Testing this search in light of the information possessed by the officer at the time he made the search, *Stergowski, supra,* at 727, we cannot justify this intrusion into defendant's inner pockets either as a protective search for weapons or as an effort to uncover evidence of a traffic offense. Once the officer had completed his otherwise proper frisk for weapons, he clearly lacked justification to proceed further.

Under the circumstances of this case, we believe that a sound regard for the policy underpinning the interim bail statute as fleshed out by the *Dixon* Court (namely, the avoidance of "unwarranted and unnecessary inconvenience, embarrassment and risk attendant incarceration for a minor traffic offense", 392 Mich at 705–706) requires us

---

[4] According to Officer Ibanez, defendant did not threaten him until *after* defendant had been placed in the backseat of the scout car.

to hold the instant search and seizure unreasonable and thus to suppress the evidence of cocaine.[5] If *Dixon* were only to apply at the station house, as the prosecutor maintains, then astute police officers would quickly learn that, absent an advice of rights under the bail statute, evidence produced in an exhaustively intrusive on-the-scene search could be admitted but evidence derived from an equally comprehensive search at the jail could not. We doubt that the Supreme Court intended to create such an anomaly. Thus, to shore up what would otherwise be a gaping loophole in the law, we hold that Officer Ibanez, after having frisked defendant for weapons and having found none, had no authority to retrieve or examine the seemingly innocuous tinfoil packets.[6] Instead, he had a duty to inform this defendant "of the statutory protection [under the interim bail act] of which he otherwise would probably be ignorant". *Dixon, supra,* at 703.

Contrary to the prosecutor's suggestion, we do not rule that police are now required "to accept bail on the street", but that arresting officers, following an external (but fruitless) pat-down for weapons, are obliged to inform a minor traffic offender of his statutory rights and upon arrival at the station house to accept bail (proffered by such

---

[5] Since the search of Martinez and the three searches of the Pontiac avowedly were founded on the officer's improper search and seizure of cocaine, we likewise require suppression of the gun found in the car. But the fruit-of-the-poisonous-tree doctrine cannot be used to condone death threats leveled against a police officer. Consequently, we leave intact defendant's convictions on charges of extortion and subornation of perjury.

[6] Unlike a panel of this Court in *People v Ridgeway,* 74 Mich App 306, 314; 253 NW2d 743 (1977), we cannot hold that a defendant's possession of a tinfoil packet *ipso facto* authorizes a search of the packet. Although controlled substances may at times be wrapped in foil, so may innumerable legitimate items.

a defendant or one acting on his behalf, *Zehrung v State, supra,* 569 P2d at 195)[7] if no magistrate is readily available for an arraignment.

Accordingly, defendant's conviction for possession of cocaine and carrying a weapon in an automobile are hereby vacated. His remaining convictions shall nonetheless stand affirmed. The matter is remanded for sentencing anew on the remaining charges.

J. H. GILLIS, J. *(dissenting).* I respectfully dissent. The majority's opinion appears to contradict a long line of well-reasoned precedent and policy.[1] Furthermore, it ignores the practicalities and intricacies of legitimate and effective law enforcement. Today's holding severely limits an age-old exception to the search and seizure warrant requirement, the right to search incidental to a lawful arrest.[2]

The majority opinion concludes that a police officer, after effectuating a full custodial arrest, may only "pat down" an arrestee in a search for

---

[7] Although lacking a statutory counterpart to Michigan's interim bail act, the Alaska Supreme Court in *Zehrung v State,* 569 P2d 189, 193 (1977), applied the "nonstatutory rationale" of *People v Dixon,* 392 Mich 691; 222 NW2d 749 (1974), to suppress evidence discovered in a warrantless, jailhouse inventory search.

[1] *See United States v Lefkowitz,* 285 US 452; 52 S Ct 420; 76 L Ed 877 (1932), *Harris v United States,* 331 US 145; 67 S Ct 1098; 91 L Ed 1399 (1947), *Trupiano v United States,* 334 US 699; 68 S Ct 1229; 92 L Ed 1663 (1948), *United States v Rabinowitz,* 339 US 56; 70 S Ct 430; 94 L Ed 653 (1950), *Preston v United States,* 376 US 364; 84 S Ct 881; 11 L Ed 2d 777 (1964), *Chimel v California,* 395 US 752; 89 S Ct 2034; 23 L Ed 2d 685 (1969).

[2] The majority holds that a police officer may only conduct a *"Terry*type" pat-down search even though the individual is under full custodial arrest. In order for a police officer to conduct a more intensive search he must have further justification (probable cause) to believe that the person arrested possesses a weapon. Hence, where a police officer feels an item which he cannot identify, which is the case here, he is precluded from searching further unless he has probable cause to believe it is a weapon.

weapons and fruits of the offense which resulted in the arrest.

The procedure set forth in the majority opinion is analogous to the procedure prescribed by the United States Supreme Court in "stop and frisk" cases.[3]

However, the policy considerations underlying the search procedures to be employed by police officers in "stop and frisk" cases are readily distinguishable from the policy considerations to be weighed when analyzing search procedures in full custodial arrest cases.

"*Terry v Ohio, supra* [392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968)], did not involve an arrest for probable cause, and it made quite clear that the 'protective frisk' for weapons which it approved might be conducted without probable cause. *Id.,* at 21–22, 24–25.

This Court's opinion explicitly recognized that there is a '*distinction in purpose, character, and extent between a search incident to an arrest and a limited search for weapons.'*

" 'The former, although justified in part by the acknowledged necessity to protect the arresting officer from assault with a concealed weapon, *Preston v United States,* 376 US 364, 367 [84 S Ct 881; 11 L Ed 2d 777] (1964), is also justified on other grounds, *ibid.,* and can therefore involve a relatively extensive exploration of the person. A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation. *Warden v Hayden,* 387 US 294, 310 [87 S Ct 1642; 18 L Ed 2d 782] (1967) (Mr. Justice Fortas, concurring). Thus it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others

---

[3] *See Terry v Ohio,* 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968).

It should be noted that *"Terry*-type" searches are permitted incidental to an investigative stop based upon less than probable cause to arrest. In the instant matter we are dealing with a full custodial arrest.

nearby, and may realistically be characterized as some-
thing less than a "full" search, even though it remains
a serious intrusion.

" ' * * * *An arrest is a wholly different kind of intru-
sion upon individual freedom from a limited search for
weapons, and the interests each is designed to serve are
likewise quite different.* An arrest is the initial stage of
a criminal prosecution. It is intended to vindicate socie-
ty's interest in having its laws obeyed, and it is inevi-
tably accompanied by future interference with the indi-
vidual's freedom of movement, whether or not trial or
conviction ultimately follows. The protective search for
weapons, on the other hand, constitutes a brief, though
far from inconsiderable intrusion upon the sanctity of
the person.' Id., at 25–26. (Footnote omitted.)

"*Terry, therefore, affords no basis to carry over to a
probable-cause arrest the limitations this Court placed
on a stop-and-frisk search permissible without probable
cause.*" United States v Robinson, 414 US 218, 227–228;
94 S Ct 467; 38 L Ed 2d 427 (1973). (Emphasis supplied.)

The majority concludes that the State of Michi-
gan via the interim bail statute, MCLA 780.581;
MSA 28.872(1), has imposed greater restrictions on
police activity than those deemed constitutionally
necessary by the United States Supreme Court.[4]
The majority bases its opinion on the premise that
the interim bail statute restricts a police officer to
a "*Terry*-type" pat-down search after effectuating
a full custodial arrest of an individual who is
charged with a traffic violation.

The legislative policy underlying the interim
bail statute is to avoid the "unwarranted and
unnecessary inconvenience, embarrassment and
risk attendant incarceration for a minor traffic
offense". People v Dixon, 392 Mich 691, 705–706;
222 NW2d 749 (1974). It does not circumvent the

---

[4] A state is free to adopt greater restrictions on police activity than
those that the Supreme Court deems to be necessary in respect to
Federal constitutional standards.

right of a police officer to guarantee his own safety by restricting his right to search an individual who is under full custodial arrest.[5]

A police officer has every right to insure that the individual he has arrested does not possess any instrument which could be used as a weapon to harm the officer or effectuate an escape.

To support its presumption that the interim bail statute restricts a police officer's ability to search incidental to a lawful arrest, the majority relies upon *People v Dixon,* 392 Mich 691; 222 NW2d 749 (1974).

However, the *Dixon* case, *supra,* is distinguishable from the case at bar. In *Dixon, supra,* there were two searches, one at the scene of the crime, and another at the station house. The latter search produced the evidence upon which Dixon was convicted. The Michigan Supreme Court concluded that the second search was in violation of Dixon's statutory right to bail. MCLA 780.581; MSA 28.872(1). The Court reasoned that the second search was an inventory search which did not stem from the objective of protecting the arresting officer. Hence, there was no need to search Dixon unless he was to be incarcerated.

In the instant matter, the search in question was conducted at the scene of the crime by the arresting officer for his own protection. Therefore, the *Dixon* case is not applicable to the facts in the instant matter.

The majority, while recognizing this factual distinction, extends *Dixon* to cover the initial search incidental to an arrest in order "to shore up what would otherwise be a gaping loophole in the law".

[5] This writer fails to see how the purpose of the interim bail statute is undermined by allowing a police officer to insure that an individual who is under full custodial arrest does not possess any weapon which might be used to harm the officer.

I cannot condone what I perceive to be an improper extension of the *Dixon* case, *supra.*

It should be noted that the *Dixon* Court carefully distinguished the facts in that matter from the United States Supreme Court cases of *United States v Robinson, supra,* and *Gustafson v Florida,* 414 US 260; 94 S Ct 488; 38 L Ed 2d 456 (1973).

"Discovery of the heroin is not validated by the opinions of the United States Supreme Court in *United States v Robinson,* 414 US 218; 94 S Ct 467; 38 L Ed 2d 427 (1973), and *Gustafson v Florida,* 414 US 260; 94 S Ct 488; 38 L Ed 2d 456 (1973).

*"The Court predicated the right to search there as an incident of the arrest and the need of the officer to protect himself.*

*"Dixon had already been searched for weapons before even entering the police car. The station house procedures were not intended nor could they be justified as a further search for either weapons or possible fruits of the crime." Dixon, supra,* at 706. (Footnotes omitted; emphasis supplied.)

The *Dixon* Court restricted its holding so as to render it inapplicable to initial searches incidental to a lawful arrest. The majority's abolition of this limitation disregards the fact that the *Dixon* Court carefully avoided issuing an opinion that conflicted with the holdings of the *Robinson* and *Gustafson* cases, *supra.*

Hence, the majority is attempting to extend the holding of the *Dixon* case to an area expressly avoided by the *Dixon* Court. Such an extension is unwarranted and is not supported by the interim bail statute or the *Dixon* case.

Therefore, I would deem the search conducted in the instant matter a valid exercise of a police officer's right to search without a warrant incidental to an arrest.

Accordingly, I would admit the contraband taken from defendant's person into evidence and affirm his conviction.